BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
JUDITH R. HARPER, OSB #903260
Assistant United States Attorney
Judi.Harper@usdoj.gov
310 West Sixth Street
Medford, OR 97501
Telephone:  (541) 776-3564
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**         Plaintiff,         v.  **$200,470.00 U.S. CURRENCY,** *in rem*,         Defendant. | 1:20-cv-02237-BR  **COMPLAINT,** *in rem*,  **FOR FORFEITURE** |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and Judith Harper, Assistant United States Attorney, for its complaint *in rem* for forfeiture, alleges:

I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to 21 U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

II.

Defendant, *in rem*, **$200,470.00** U.S. Currency, was seized in the District of Oregon, and is now and during the pendency of this action will be within the jurisdiction of this Court.

III.

Defendant, *in rem*, **$200,470.00** U.S. Currency represents proceeds traceable to an exchange for controlled substances or was used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 841(a)(1), and is forfeitable to the United States pursuant to the provisions of 21 U.S.C. § 881(a)(6), as more particularly set forth in the declaration of Jed Rzegocki, Task Force Officer, Homeland Security Investigations, marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, plaintiff, United States of America, prays that due process issue to enforce the forfeiture of defendant, *in rem*, **$200,470.00** U.S. Currency, that due notice be given to all interested persons to appear and show cause why forfeiture of these defendants, *in rem*, should not be decreed; that due proceedings be had thereon; that these defendants be forfeited to the United States; that the plaintiff United States of America be awarded its costs and disbursements incurred in this action.

DATED: **December 22, 2020.**          Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*s/ Judith R. Harper*
**JUDITH R. HARPER**
Assistant United States Attorney

## VERIFICATION

I, Jed Rzegocki, declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Task Force Officer with the Homeland Security Investigations and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.

<u>s/Jed Rzegocki</u>
Task Force Officer Jed Rzegocki
Homeland Security Investigations

# DECLARATION of JED RZEGOCKI

I, Jed Rzegocki, do hereby declare:

## BACKGROUND/EXPERIENCE

1. I am a Detective with the Oregon State Police Drug Enforcement Section. I have been employed as an Oregon State Police Officer since July 1997. Further, as part of the Oregon State Police Drug Enforcement Section, I am assigned to the Oregon-Idaho High Intensity Drug Trafficking Area (HIDTA) Interdiction Team. I completed my initial Oregon State Police training at the Oregon State Police Basic Officer Academy, in Warrenton, Oregon in 1997, where I learned the skills necessary to conduct state criminal investigations, including investigating crime scenes, interviewing witnesses and suspects, and writing reports and affidavits. I am also cross designated as a Task Force Officer with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) and have been a Task Force Officer (TFO) with HSI since March 2018. As it relates to HSI, I am currently assigned to the Resident Agent in Charge (RAC) Office located in Medford, Oregon. In March 2018, I attended the HSI Task Force Officer Training in Seattle, Washington, which covered various topics including federal-level criminal investigations incorporating money laundering investigations, drug investigations, and evidence handling. During my tenure as a state and federal Task Force Officer, I have investigated and/or participated in hundreds of investigations of money laundering, narcotics trafficking, homicide, theft, burglary, and various other types of criminal investigations. I have also acquired knowledge and information about the illegal drug trade and the various means and methods by which it is furthered from formal and informal training, other law enforcement officers and investigators, informants, individuals I have arrested and/or interviewed, and my participation in other investigations.

**Declaration of Jed Rzegocki**                                                                 **Page 1**

2. I have participated in searches of vehicle and premises and assisted in evidence gathering by means of search warrant and consent. I have received training in investigating money laundering and have had the opportunity to study and investigate numerous examples of money laundering schemes specifically pertaining to the laundering of drug proceeds. I have received training from the Oregon State Police and HSI regarding asset forfeiture and financial investigations as well as training at conferences.

3. I have participated in hundreds of investigations at the federal and state levels. These investigations have pertained to narcotics trafficking and laundering drug proceeds as well as a variety of criminal activities including bulk cash smuggling, drug trafficking, possession/manufacture/distribution of various amounts of marijuana, methamphetamine, cocaine, heroin, ecstasy, LSD, prescription pills and psilocybin mushrooms.

## PURPOSE OF THIS DECLARATION

4. This declaration is submitted in support of a civil complaint *in rem* for forfeiture of $200,470 in U.S. currency seized from Matthew Patterson during a traffic stop on July 29, 2020, on State Route 140W (SR 140W) in the vicinity of milepost 50 in Klamath County, Oregon. As discussed below, I believe there is probable cause to believe that the $200,470 is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as it constitutes moneys intended to be furnished by any person in exchange for a controlled substance or the proceeds traceable to an exchange of controlled substance in violation of 21 U.S.C. § 841, specifically marijuana, a schedule I controlled substance, or moneys used or intended to be used to facilitate any violation of 21 U.S.C. § 841(a)(1), specifically the manufacture and distribution of marijuana.

5. I have participated in this investigation and the following information is derived from my personal observation, interviews, and review of physical evidence as well as review of

reports generated by other law enforcement officials and discussions with other investigators who have personal knowledge of the matters covered in those reports, and from conversations with persons who have personal knowledge of the events described herein. I have not included all of the details of the investigation, only those facts that I believe necessary to demonstrate a probable cause to proceed with civil forfeiture of the $200,470.

6. I know from my training and experience that Oregon legalized the production and sale of marijuana and that marijuana remains illegal in many U.S. States. Marijuana grown in Oregon sells for far less in Oregon than it sells for in states where it remains illegal. In my training and experience, I have found it common for marijuana grown in Oregon to be transported to or sold in other states, often for cash. I am also aware that the production of hemp is regulated in Oregon and that it is common to claim that what appears to be cash associated with the sale of marijuana is from the sale of regulated hemp. I am also aware marijuana sells for significantly more than legal hemp and that because hemp is legal, these sales are typically documented like any other legal or regulated product.

## SUMMARY OF THE INVESTIGATION

7. On July 29, 2020, at approximately 7:52 PM, Oregon State Police (OSP) Sergeant Hopson was working in a marked OSP patrol car traveling westbound, on SR 140 near mile post 60, which is marked as a 55 mile per hour speed zone. Sergeant Hopson observed a black Chrysler Voyager minivan heading ahead of him, traveling in the same direction, going in excess of 61 miles per hour, which is a violation of Oregon law. He was able to overtake the vehicle and travel behind it; he observed further driving behavior, which included the vehicle straddling a lane divider on a multi-lane portion of the westbound travel lanes near milepost 56. The van operator reduced his speed to below the posted speed but failed to yield to vehicles traveling

behind it as required by Oregon law. Sergeant Hopson initiated a traffic stop in the vicinity of mile post 50.  The vehicle was bearing Pennsylvania license plate number LGE1852. Prior to stopping the van, Sergeant Hopson conducted a license plate check of the vehicle and confirmed it was a rental vehicle. Sergeant Hopson has conducted numerous investigations stemming from his own traffic stops, over the past several years, that specifically included bulk marijuana smuggling coming from the Southern Oregon area (Medford, Grants Pass, Cave Junction, etc.) as well as persons transporting bulk US currency to this area of Oregon, from out of state, to facilitate the purchase and illegal export of bulk marijuana to other states where he knows marijuana can be sold at a significant profit.

8. During the stop, Sergeant Hopson identified the driver as Matthew Patterson, the lone occupant of the rental minivan. Sergeant Hopson observed a suitcase on the third row of seats and a large cardboard box on the second row of seats, which raised his suspicion. He knew minivans are commonly rented for excess cargo or multiple passengers, but the driver was alone with minimal luggage. He knew rental vehicles are commonly used for marijuana trafficking for a variety of reasons to include defeating license plate readers (LPR's), reliable transportation, and the renter not having to risk involving their personally owned vehicle (POV) in the trafficking of narcotics or bulk cash. Sergeant Hopson knew minivans are generally more expensive to rent than compact/economy cars, not as fuel efficient, and generally are not chosen for cross-country trips for single occupants with minimal luggage. Based on his training and experience, Sergeant Hopson knew persons involved in marijuana trafficking believe minivans blend into normal traffic more so than smaller compact rental vehicles and believe they are less likely to be pulled over by law enforcement officers. Furthermore, minivans are commonly utilized for bulk marijuana smuggling for the cargo space.

**Declaration of Jed Rzegocki**                                                                                          **Page 4**

9. Sergeant Hopson knows SR-140 leads to areas of Oregon that are major source areas of marijuana. He knew southern Oregon produces bulk marijuana and produces more marijuana than Oregon citizens can consume. He is familiar with various other marijuana products such as marijuana extract being produced in large quantities in these same areas. He knew most of this marijuana leaves the State of Oregon, via the black market. He knew most of this marijuana leaves via the highway system. He knew SR 140 is one of the more commonly used highways by persons trafficking illegal marijuana, as it is the suggested route on GPS to travel to and from many of the source/destination areas. He knew, typically speaking, large amounts of U.S. currency travel west on SR 140 in order to purchase bulk marijuana, and bulk marijuana travels east to the destination areas.

10. Sergeant Hopson explained the reason for the traffic stop to Patterson and that the conversation was recorded. He asked Patterson for his driver's license, registration, insurance and rental agreement; Patterson produced a New Jersey driver license in the name of Matthew J Patterson. Patterson used his cell phone to provide an electronic vehicle rental agreement, which showed the vehicle was rented in Boise, Idaho this same date (July 29, 2020) and it was due in Newark, New Jersey on August 8, 2020. The estimated cost of this rental on the agreement was just over $1,900. Patterson did provide the vehicle registration but was not sure if he accepted the insurance from the rental company.

11. Sergeant Hopson knew persons involved in marijuana trafficking often use the mail or other delivery systems to avoid detection. He knew bulk currency is often mailed to source areas such as Medford, Oregon. He also knew from training and experience that this money is seized many times when mailed to source areas of marijuana. The large cardboard box in the van had excessive taping on it and appeared new. The box was consistent with a normal size U-Haul

**Declaration of Jed Rzegocki**                                                                                     **Page 5**

moving box. Based on his training and experience, Sergeant Hopson reasonably believed the driver mailed bulk currency to Boise, Idaho, to lessen the chance of the currency being seized. He believed the driver then flew to Boise to pick up the currency and would then use the currency to purchase bulk marijuana. As a result of being in possession of bulk marijuana on the return trip, the driver would not be able to fly home, which would explain the vehicle needing to be returned in New Jersey. He knew plane tickets are currently very cheap. He knew it would be substantially cheaper and make much more sense to fly to New Jersey than to rent a vehicle for nearly $2,000 and drive across the country. Additionally, there would be additional expenses for fuel, food and hotels.

      12. Patterson told Sergeant Hopson his address in New Jersey was still current. He said he had Progressive Insurance and could obtain proof on his cellphone. He attempted to pull up the insurance but was having difficulty. Sergeant Hopson asked Patterson how he got to Boise. Patterson stated he flew. This confirmed Sergeant Hopson's belief that Patterson had mailed the box to himself. Sergeant Hopson asked the driver to bring his phone back to the patrol vehicle, so he could obtain proof of insurance and Patterson complied. At the patrol vehicle, while working on normal traffic stop procedures, Sergeant Hopson asked the driver where he was headed. Patterson displayed signs of deceptive behavior when answering this question. He stated he was going to see a friend, but quickly changed it to a cousin. Patterson stated that he was going to Medford, Oregon. Sergeant Hopson asked how long he was staying in Medford, Oregon. Again, Patterson displayed signs of deceptive behavior prior to telling him a "few days." The rental was due on August 8th, so Patterson's trip details were consistent with marijuana trafficking.

13. Sergeant Hopson asked Patterson if he had ever been to Oregon. Patterson stated he had, but he seemed bothered by the question. Sergeant Hopson asked, "this part or another part," but instead of telling him, he told him he went camping. Patterson also stated to Sergeant Hopson he planned on camping on this trip. He was asked why he flew into Boise and not Medford and Patterson said because it was cheaper. This was not logical considering the rental vehicle alone was nearly $2,000. Sergeant Hopson knew there are several airports that would have been closer to Medford (Medford, Portland, Reno, Eugene) than Boise; this meant the driver flew across the country and was now driving approximately eight hours to visit his "cousin" prior to driving over 40 hours back to New Jersey instead of flying home.

14. Sergeant Hopson asked Patterson for his cousin's name. After an approximately three second pause, he told him "Brian" while shaking his head, indicating no. Hopson recognized this as deceptive behavior. Hopson asked if Patterson knew how to get where he was going. He said he was going to the hotel that was in his GPS. Patterson said he was going to stay at the hotel. Prior to this, he stated he was going camping.

15. During the interaction with Sergeant Hopson, Patterson appeared to be sending text messages. Sergeant Hopson noticed that Patterson became increasingly nervous and could visibly see Patterson's carotid artery pulsating rapidly. Sergeant Hopson asked him to stay off his phone, so they could talk. He agreed and put his phone in his pocket. However, moments later, he began using his phone again. Sergeant Hopson asked him why he was not flying back home to New Jersey. Patterson stated he was going to go camping on the way back. Hopson asked where he planned on camping. Patterson said he was going to camp in Salt Lake City and Wyoming. Again, the rental was due to be returned on August 8th. Sergeant Hopson asked about the cardboard box and Patterson claimed that it contained camping equipment.

**Declaration of Jed Rzegocki**                                                                                  **Page 7**

16. Sergeant Hopson asked the driver if he had a large amount of U.S. currency. Patterson claimed that he did not. Hopson asked him again if he brought a large amount of money to go camping, or to spend in Medford or to hang out with his cousin and Patterson said he did not. Sergeant Hopson asked how much currency he had in the van and on his person. Patterson stated he had what was in his wallet. Sergeant Hopson asked him why he would not return the car in Boise and fly home. He told him, "That's just how I set it up." Sergeant Hopson looked down at Patterson's phone and observed he had connected a call with someone. Sergeant Hopson told him he could end the call if he wanted. Patterson placed the phone back in his pocket. Sergeant Hopson asked for his consent to search the van, Patterson denied consent. Patterson was advised of his Miranda Rights and detained with handcuffs.

17. Sergeant Hopson looked up Patterson's rental history with Enterprise and noted a rental in December 2019 from Reno, Nevada to Newark, New Jersey; the driver had the vehicle for seven days and accumulated approximately 2,700 miles and the rental was $1,482.55, which does not include gas, food, lodging, etc.

18. When the probable cause search of the vehicle began after a cover officer arrived, Sergeant Hopson located a backpack in the van that contained a black vacuum-sealed package. Although the package contents were not visible, it was consistent with packaging containing US currency. Loose currency was also located within the backpack. The large cardboard box had a shipping label on it indicating it was shipped from New Jersey via UPS Second Day Air for pick up at a Boise UPS store. Sergeant Hopson noted new camping items in the cardboard box that appeared to be prop items. He opened the rear cargo door of the van and observed a large bag he had previously seen when walking around the van. The bag was a large tent for multiple persons with a lock on it. Sergeant Hopson cut the piece of zipper string that the lock was attached to and

opened the bag. He observed multiple vacuum-sealed packages under the tent. There were additional packages within the tent. All packages were vacuum-sealed with a black material. Several more bundles of U.S. currency, concealed within clothing items inside Patterson's suitcase, were located. In all, 14 vacuum-sealed packages of U.S. currency were located. Two additional Apple iPhones were in the vehicle – one in the backpack and one under the radio. All currency was seized as evidence. Sergeant Hopson located a receipt in the driver's pocket, which was later revealed to be the receipt when Patterson picked up the shipping box in Boise, Idaho after he landed. The vehicle was towed and Patterson was transported to the Oregon State Police Klamath Falls Patrol Office.

19. I responded from the Central Oregon area to assist in the investigation. Oregon State Police Drug Enforcement Sergeant Cliff Barden also responded and attempted an interview with Patterson, but Patterson declined to make a statement. When I arrived at the Oregon State Police Klamath Falls Patrol Office at about 11:20 p.m., I saw numerous vacuum-sealed bags of US currency on the patrol room table. Using my assigned money counter, Sergeant Barden assisted me with the currency count, which totaled $200,470. Of that currency, $9,000 had been in a vacuum-sealed bag that had been located by Sergeant Hopson in the backpack and $10,950 had been in a vacuum-sealed bag in a suitcase. Patterson had $750 in US currency in his wallet that I hand-counted; that currency was not seized. The seized currency, in addition to being in vacuum-sealed bags, was also bundled with rubber bands. This is consistent with the numerous other money-laundering cases I have been involved with that tie to drug dealing and bulk cash smuggling and is not the manner in which a financial institution disperses currency. The US currency was placed into evidence bags and sealed and double-signed by Sergeant Barden and Sergeant Hopson.

20. I seized the US currency as an HSI-TFO, told Patterson I was seizing the US currency, and asked him to confirm his address and phone number, which he did. Patterson respectfully declined to abandon the currency and declined to consent to have the data extracted from his iPhones that were in his possession when he was arrested.

21. Patterson was provided by Sergeant Hopson an Oregon State Police Property Report form noting the seized items, including the currency and iPhones. Sergeant Hopson then transported Patterson to a nearby hotel for lodging.

22. The next day (July 30, 2020), I contacted then-HSI Special Agent Jarred Cronenworth in Boise, Idaho and requested he go to the UPS store noted on the cardboard box from the rental van and obtain information. The label had the sender as "Matt Patterson (646-675-4494)", "The UPS Store 6938 434 Kearny Ave NJ 07032" and was bearing tracking number "1Z0F33560280731853". SA Cronenworth investigated and told me he had been by the UPS Store in Boise and confirmed Patterson signed for the box that was found in the van. I contacted the UPS Store in Kearny, New Jersey from where the box was shipped. On August 8th, I received a copy of the "Shipment Details" that shows it was shipped by Patterson (including listing his name/address/phone number) to the UPS Store in Boise and "Hold for Pickup". The total to ship the box was "$406.56", which was paid for by a chip-read credit card, verified by PIN.

23. In performing post-seizure follow-up, I located a Facebook page for Patterson. The information on it was very limited, but it had two photos. One of which was of a female later identified as Michelle Rozalski. On her Facebook page, it shows she is engaged to Patterson and that she is a "Co-Founder at ZIANE Active". In performing open-source inquiry into that

company, it appears to be an athletic apparel company (www.zianeactive.com) for women, but nothing notes Patterson on the website.

24. For Patterson, the address he listed on his driver license appears to be an apartment. The address, using open-source information appears to have two businesses using the address: "Gig & Pop Entertainment LLC" showing annual sales, as of July 2020, of $17,206 and lists Patterson as the "Registered Agent" – this information is provided by "Dun & Bradstreet, Inc". I could not find a website for this company. New Jersey's corporation searching website has it listed as active with an incorporation date in February 2018. Another business at this address listing Patterson as the "Registered Agent", is "Inspire or Retire LLC". The online presence I located were on Facebook and on its own website: https://www.facebook.com/inspireorretire/ and www.inspireorretire.com/, both of which have minimal content and followers. Further, on the stand-alone website, the "contact" page/button is disabled and on the Facebook page, it only has ten (10) people "following"; New Jersey has it listed on their corporation search website as being active with an initial filing in January 2019.

25. I was granted a search warrant by Klamath County Circuit Court Judge Alycia Kersey on September 9, 2020 for the three seized iPhones, which included data extraction and analysis. When I reviewed the data that was extracted for the iPhone that Patterson had on his person, I noted several items of interest: in the "Images" portion of the phone, there were numerous photographs of marijuana buds, bulk marijuana packaged for sale in clear  bags, and an image of a male dumping what appear to be black vacuum-sealed bags of marijuana from a black garbage bag, onto the floor.

26. There were several images of indoor and outdoor marijuana grows in various stages of growth. One photo showed a sheet of paper that lists "carts oil" (with various strains listed below it), and "edibles" with strains below is. In another column that was scratched out, the title of the column was "LA Sales"; another column scratched out had the title of "Shipping Funds Mailed"; and the last scratched out column listed a title of "Shipping Funds Wired". "Carts" is a common term in the marijuana industry for "cartridges", which are highly concentrated marijuana THC oil encapsulated in a small, often clear, cylinder that are then used in a vaping device. These concentrated cartridges often have THC content that are 70-90% THC. "Edibles" is another marijuana industry term for food items containing THC. Common edibles resemble the typical "gummy bears" to bakery-quality cookies. To me, this showed a marijuana/marijuana products-related business drug ledger.




*Image from Patterson phone*

*Image from Patterson phone   Drug ledger image from Patterson phone*

**Declaration of Jed Rzegocki**                                                                 **Page 12**

27. I also found "selfies", images of Patterson and Rozalski, which showed possessory interest in the iPhone for Patterson.


*Image of packaging operation from Patterson phone*

28.  In a cursory review of the data from two of the three iPhones seized, I noted one phone had limited data. The other phone had numerous images of marijuana, marijuana for sale, marijuana products, marijuana products for sale, and images of marijuana grows. Several messages were exchanged with, yet to be identified persons, advertising in plain language and drug slang marijuana and marijuana products for sale. I am still attempting to identify if Patterson is the true owner of these two iPhones.



29. Matthew Patterson submitted an administrative claim for the money via an attorney.  In his claim he stated, "Currency was in my


*Above three images from Patterson phone*

possess when my rental vehicle was stopped by Klamath County Sheriff, searched, and currency was seized. The currency was my profits of legal business transactions." He provided no documentation or other information supporting his claim or what type of "Legal business transactions" or where the US currency was derived from other than drug proceeds of an illegal marijuana sales business operating under the guise of "Gig & Pop Entertainment LLC".

30. Based on the above, and my training and investigative experience, I have probable cause to believe that the $200,470 in U.S. Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as it constitutes moneys intended to be furnished by any person in exchange for a controlled substance or the proceeds traceable to an exchange of controlled substance in violation of 21 U.S.C. § 841, specifically marijuana, a schedule I controlled substance, or

moneys used or intended to be used to facilitate any violation of 21 U.S.C. § 841(a)(1), specifically the manufacture and distribution of marijuana.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Executed this 21st day of December 2020.

<u>s/Jed Rzegocki</u>
Jed Rzegocki
Task Force Officer
Homeland Security Investigations
Detective-Oregon State Police

≈JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America

## DEFENDANTS
$200,470.00, U.S. Currency, in rem

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Klamath**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Judith R. Harper - United States Attorney's Office
310 W. Sixth Street, Medford, OR 97501

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- [X] 1   U.S. Government Plaintiff
- [ ] 2   U.S. Government Defendant
- [ ] 3   Federal Question (U.S. Government Not a Party)
- [ ] 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury  - Product Liability | ☒ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893  Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

- [X] 1   Original Proceeding
- [ ] 2   Removed from State Court
- [ ] 3   Remanded from Appellate Court
- [ ] 4   Reinstated or Reopened
- [ ] 5   Transferred from another district (specify)
- [ ] 6   Multidistrict Litigation
- [ ] 7   Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
21 U.S.C. § 841(a)(1) and 21 U.S.C. § 881(a)(6)

Brief description of cause:
forfeiture of proceeds used or intended to be used to facilitate narcotics trafficking

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE: 12/21/2020

SIGNATURE OF ATTORNEY OF RECORD: s/ Judith R. Harper

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____